**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAVID W. WEBSTER, JR.<br>434 Olympic Avenue<br>Buffalo, New York 14215<br><br>Plaintiff,<br><br>v.<br><br>THE CITY OF BUFFALO<br>c/o Corporation Counsel<br>65 Niagara Square, 1100 City Hall<br>Buffalo, New York 14202<br><br>JAMES OTWELL, individually and in his capacity as a Lieutenant of the Buffalo Police Department,<br>c/o Buffalo Police Department<br>68 Court Street<br>Buffalo, New York 14202<br><br>GERALD P. LEWANDOWSKI, individually and in his capacity as a Buffalo Police Officer,<br>c/o Buffalo Police Department<br>68 Court Street<br>Buffalo, New York 14202<br><br>GIOVANNI M. MASSIMI, individually and in his capacity as a Buffalo Police Officer,<br>c/o Buffalo Police Department<br>68 Court Street<br>Buffalo, New York 14202<br><br>ADHAM MOHAMED SALEH, individually,<br>c/o ATA Property Development, Inc.<br>16930 Keppen Avenue<br>Allen Park, Michigan 48101<br><br>JOHN DOE (a.k.a. "AK"), individually,<br>[address unknown]<br><br>Defendants. | **COMPLAINT**<br>**AND JURY DEMAND**<br><br>Civil Action No. ____________ |

Plaintiff, David W. Webster, Jr. ("Plaintiff" or "Mr. Webster"), by his attorneys, Davenport Law PLLC, as and for his complaint against Defendants, the City of Buffalo, James Otwell, Gerald P. Lewandowski, Giovanni M. Massimi, Adham Mohamed Saleh, and John Doe (a.k.a. "AK") (collectively, "Defendants"), alleges as follows:

## PRELIMINARY STATEMENT

1. On the afternoon of June 5, 2024, Buffalo Police officers stood inside David Webster's pet shop on Fillmore Avenue, watched his own surveillance video of the confrontation that had just occurred, and told him what he already knew: that his landlord had no right to put him out, that Mr. Webster had every right to defend his business, and that no one was going to jail. Minutes later Mr. Webster was in handcuffs, charged with a class C felony. Not because any fact had changed, but because he had asked those officers for their names and badge numbers so that he could press charges against the landlord they had just refused to arrest. The ranking officer at the scene gave the order in six words captured on his own body-worn camera: "Yeah, you talked yourself into it."

2. What followed was $80,000 bail Mr. Webster could not pay, six days in the Erie County Holding Center, a court order barring him from his own store and from the more than fifty animals in his sole care, the surrender of three lawfully owned firearms, and five months of a felony prosecution the People abandoned without ever once defending it. Every charge was dismissed. Neither the landlord nor a single Buffalo Police officer ever appeared at a single court date.

3. None of this was an aberration. The City of Buffalo has been sued, repeatedly and recently, by people who say Buffalo Police officers arrested them for the offense of objecting. It paid to settle one such case in 2026. It has been told by its own released records that fewer than

one in ten misconduct allegations against its officers is ever sustained. And the City's own arrest data, produced to Plaintiff under the Freedom of Information Law, shows that the police district that arrested Mr. Webster departs sharply from the rest of Buffalo in whom it arrests for the two offenses charged here.

4. Mr. Webster was thirty-eight years old. He had called the police himself. He lost his liberty, his firearms, and his business because he asked a Buffalo Police officer to identify himself. By way of this action, Plaintiff seeks damages and the vindication of his rights under the United States Constitution.

## JURISDICTION

5. This action arises under 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§ 1331 and 1343, as this action seeks redress for the deprivation of Plaintiff's constitutional and civil rights under color of state law.

6. Plaintiff further seeks all relief available pursuant to 42 U.S.C. § 1988, including reasonable attorneys' fees and costs.

## VENUE

7. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Western District of New York because the events and omissions giving rise to Plaintiff's claims occurred within this District, including in the City of Buffalo, New York.

## PARTIES

8. Mr. Webster is a citizen of the State of New York and currently resides in Erie County, at 434 Olympic Avenue, Buffalo, New York 14215.

9. Defendant, the City of Buffalo (the "City"), was and is a municipal corporation duly organized and existing under the laws of the State of New York and has a business address at City Hall, 65 Niagara Square, Buffalo, New York 14202.

10. At all times hereinafter mentioned, the City has operated and continues to operate a municipal police department, the Buffalo Police Department, headquartered at 68 Court Street, Buffalo, New York 14202.

11. Defendant, the City, through its Common Council, Corporation Counsel, and their officers, agents, servants, employees, and/or specialized units, promulgates, implements, reviews, and/or enforces, as policymaker, certain policies regarding the conduct and actions of police officers employed by the City, including Defendants Otwell, Lewandowski, and Massimi.

12. Defendant, James Otwell, was and is a Lieutenant employed by the City of Buffalo in the Buffalo Police Department. At all times hereinafter mentioned, he was acting within the scope of his employment and official capacity as a member of the Buffalo Police Department. The Buffalo Police Department's Central Booking Bureau case history for Mr. Webster's arrest records Defendant Otwell as the supervising officer. Defendant Otwell is sued for his own conduct, and not on any theory of respondeat superior: he personally ordered Mr. Webster's arrest. Defendant Otwell is being sued in his individual capacity for damages caused by his actions and conduct.

13. Defendant, Gerald P. Lewandowski, was and is a Police Officer employed by the City of Buffalo in the Buffalo Police Department, assigned at all relevant times to C District,

Assignment 421. At all times hereinafter mentioned, he was acting within the scope of his employment and official capacity as a Buffalo Police Officer. Defendant Lewandowski is recorded as the arresting officer on the Buffalo Police Department's Arrest Data Form and Arresting/Booking Report for Mr. Webster's arrest. Defendant Lewandowski is being sued in his individual capacity for damages caused by his actions and conduct.

14. Defendant, Giovanni M. Massimi, was and is a Police Officer employed by the City of Buffalo in the Buffalo Police Department. At all times hereinafter mentioned, he was acting within the scope of his employment and official capacity as a member of the Buffalo Police Department. Defendant Massimi is recorded as the assisting officer on the Arrest Data Form and Arresting/Booking Report for Mr. Webster's arrest, and as the officer who submitted the shotgun into evidence. Defendant Massimi is being sued in his individual capacity for damages caused by his actions and conduct.

15. Defendants Otwell, Lewandowski, and Massimi are referred to collectively herein as the "Defendant Officers."

16. Buffalo Police Officers Ranique Lewis and Aaron Stenzel and Detective Lauren Sterlace are not named as defendants, but their conduct is alleged herein. The Central Booking case history records Officers Lewis and Stenzel as having assisted in Mr. Webster's arrest and Detective Sterlace as having taken the sworn supporting deposition of Defendant Saleh.

17. Upon information and belief, Defendant, Adham Mohamed Saleh, is an adult individual and the president and manager of ATA Property Development, Inc., a corporation with a business address at 16930 Keppen Avenue, Allen Park, Michigan 48101, which at all relevant times owned and leased to Mr. Webster the premises at 1413 Fillmore Avenue, Buffalo,

New York 14211. Defendant Saleh is being sued in his individual capacity for damages caused by his actions and conduct.

18. Defendant, John Doe (a.k.a. "AK"), is an adult individual whose true name is presently unknown to Plaintiff. Upon information and belief, Defendant Doe performed maintenance for the building at 1413 Fillmore Avenue and operates the adjacent storefront. Defendant Saleh described him in his sworn statement to the Buffalo Police Department as his brother. Defendant Doe is being sued in his individual capacity for damages caused by his actions and conduct. Plaintiff will amend this Complaint to substitute Defendant Doe's true name when it is ascertained.

19. Defendants Saleh and Doe are referred to collectively herein as the "Private Defendants." At all relevant times, the Private Defendants acted under color of state law by willfully participating in joint activity with the Defendant Officers, as alleged below.

20. At all relevant times, the Defendant Officers were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, policies, customs, ordinances, usages and/or practices of the City of Buffalo. Defendants' actions and conduct show that they did not, nor could they, reasonably rely upon any existing law to justify their actions and conduct.

## FACTUAL ALLEGATIONS

### A. Mr. Webster and Buffalo Turtle Zoo

21. Plaintiff David W. Webster, Jr. was born June 12, 1985. At the time of the events alleged herein he resided at 69 Woeppel Street, Buffalo, New York 14211, approximately a five-minute walk from his shop at 1413 Fillmore Avenue.

22. As of June 5, 2024, Mr. Webster was thirty-eight years old. The local warrant, DCJS, NCIC, probation and parole checks run by the Buffalo Police Department on the day of his arrest all returned negative.

23. Mr. Webster owned and operated Buffalo Turtle Zoo, LLC, a rescue and exotic pet shop at 1413 Fillmore Avenue, Buffalo, New York 14211. It was the first Black-owned exotic pet store on Buffalo's east side.

24. The shop housed more than fifty live animals, for which Mr. Webster was solely responsible. He fed and cleaned the animals himself daily.

25. Mr. Webster lawfully owned three firearms: a Tri Star 12-gauge shotgun, serial number 20P1201132; a Smith & Wesson M&P 15-22; and an Aero Precision M16A4. He kept the shotgun at the shop.

26. The shop was covered by Mr. Webster's own video surveillance system. That system recorded the events of June 5, 2024, and Mr. Webster offered the recording to the responding officers within minutes of their arrival.

**B. The Tenancy and the Morning of June 5, 2024**

27. Mr. Webster leased 1413 Fillmore Avenue under a written lease dated August 4, 2023. The landlord of record is ATA Property Development, Inc., 16930 Keppen Avenue, Allen Park, Michigan 48101. Defendant Adham Mohamed Saleh signed the lease on the landlord's behalf as its manager, and signed the subsequent fourteen-day notice as its president.

28. Rent was $1,200 per month.

29. The building was in serious disrepair. The roof leaked into the shop, requiring Mr. Webster to keep buckets on the floor. The basement flooded to knee height and destroyed property stored there. A front window was cracked. A plumbing leak went unrepaired.

30. Mr. Webster withheld a portion of his rent because of those conditions. He and the landlord's maintenance agent had discussed a payment plan conditioned on repairs being made.

31. In April 2024, ATA Property Development, Inc. commenced a nonpayment proceeding against Buffalo Turtle Zoo, LLC in Buffalo City Court, Index No. LT 001543-24/BU, seeking $10,800.

32. The proceeding was adjourned twice and ultimately calendared for 10:00 a.m. on June 5, 2024.

33. Mr. Webster appeared that morning without counsel. Mr. Saleh did not appear. Mr. Saleh's attorney represented to the court that Mr. Saleh was out of town and could not attend.

34. The court directed that Mr. Webster would have sixty days to vacate the premises, and that he would owe no back rent if he vacated within that period.

35. Mr. Webster accordingly had the lawful right to occupy and operate his business at 1413 Fillmore Avenue through approximately August 4, 2024. No warrant of eviction had issued, and no officer of the court was authorized to remove him.

**C. Saleh and His Companion Confront Mr. Webster**

36. At approximately 3:35 p.m. on June 5, 2024, hours after his attorney told the court he was unavailable, Mr. Saleh arrived unannounced at Buffalo Turtle Zoo.

37. Mr. Saleh was accompanied by a second man, sued herein as Defendant John Doe (a.k.a. "AK"), whose true name is presently unknown to Plaintiff and will be substituted when ascertained in discovery. Mr. Webster knew him only as "AK." He performed maintenance for the building and operates the adjacent storefront. Mr. Saleh described this man in his own sworn statement to the Buffalo Police as his brother. Mr. Webster's criminal defense counsel described him on the record in Buffalo City Court as Mr. Saleh's employee.

38. Mr. Webster had never met Mr. Saleh before that moment. Their prior dealings had been by telephone, and the building's day-to-day maintenance had been handled by AK.

39. Mr. Saleh asked for the owner. Mr. Webster identified himself. Mr. Saleh told him to gather his belongings and leave the premises immediately.

40. Mr. Webster explained that the court had granted him sixty days that same morning, and that he had nowhere to move more than fifty live animals on no notice.

41. Mr. Saleh responded that he did not care what the judge had ordered.

42. Mr. Saleh escalated. He shouted profanities, flailed his arms, and advanced on Mr. Webster inside Mr. Webster's own place of business. Among the statements captured on the store's surveillance recording and later read into the record in Buffalo City Court: "You've got to understand right now, you don't know who you're messing with," and "I'll fuck you up like a bitch. I'll can you out on your ass like a bitch."

43. An independent witness, Valdeana Shanklin, a Block Club Coordinator who was present, documented that same day that Mr. Webster reported the building's owner had told him, "You better get the fuck out; you don't know who you are fucking with."

44. Mr. Saleh handed paperwork to AK and moved into Mr. Webster's face. Mr. Saleh had no warrant of eviction and no lawful authority to remove Mr. Webster or to demand that he vacate that day.

45. As Mr. Saleh advanced, Mr. Webster observed him reaching toward his side in a manner Mr. Webster understood to indicate that Mr. Saleh might be armed. Mr. Webster was unsure whether a weapon was present.

46. Mr. Webster retreated, backing further into the store as the two men continued advancing.

**D. Mr. Webster Calls the Police and Acts in Self-Defense**

47. Mr. Webster directed an associate present in the store, Ritkesha Jackson, to call 911. She was already doing so. Mr. Webster was the party who summoned the police.

48. Only after being cornered, threatened, and backed into the rear of his own store did Mr. Webster retrieve the Tri Star 12-gauge shotgun he lawfully kept behind the register.

49. Mr. Webster kept the barrel of the shotgun pointed at the floor at all times. He never raised it, never aimed it at Mr. Saleh or at AK, and never touched either man.

50. Mr. Webster said words to the effect of: get out of my shop, you are here threatening me, I do not want a fight, I do not want any problems, leave.

51. Mr. Saleh went to the door. On his way out, he told his companion to call the police, a call Mr. Webster had already caused to be placed.

52. Mr. Saleh then remained outside the storefront, continuing to argue through the doorway. Mr. Webster had to pull the door out of Mr. Saleh's hand in order to close and lock it.

53. At no point did Mr. Webster commit any crime. He was a lawful occupant of the premises, in possession of a lawfully owned firearm, responding to a man who had threatened him and who had no legal right to remove him.

**E. The Officers Arrive, Watch the Video, and Conclude No Crime Occurred**

54. Buffalo Police officers responded to 1413 Fillmore Avenue. Defendants Lewandowski, Massimi, and Otwell were present throughout the encounter, as were Officer Ranique Lewis, Officer Aaron Stenzel, and Detective Lauren Sterlace, who are not named as defendants but whose conduct is alleged herein. The presence and function of each is recorded in the Buffalo Police Department's own Central Booking Bureau case history for this arrest.

55. The encounter was recorded on the officers' body-worn cameras. At least one such recording, Axon Body 3 video file X60A85998, is in Plaintiff's possession.

56. Mr. Webster was calm and cooperative with the officers throughout. He explained what had happened and immediately offered them his store's surveillance footage.

57. The officers watched Mr. Webster's surveillance video at the scene.

58. Having watched it, the officers stated on their own body-worn cameras that Mr. Webster had never pointed the shotgun at Mr. Saleh; that he had told Mr. Saleh only to get out of his business; that the firearm was legally owned; and that Mr. Webster had reported never having seen Mr. Saleh before that day.

59. The officers further observed on camera that Mr. Saleh had arrived with no valid eviction paperwork, and that their intended course of action was to direct Mr. Saleh to return with proper papers.

60. Defendant Otwell stated on camera, in substance: "No one's going to jail. You have the right to defend your business.... They were wrong, but they're not wrong enough to go to jail. I advised them they have to go get the proper paperwork."

61. Every Defendant Officer therefore knew, before any arrest was made, that Mr. Webster had committed no crime. Each had viewed or had access to dispositive exculpatory video. Each had affirmatively concluded that no one would be arrested.

62. As of that moment there was no probable cause to arrest Mr. Webster for menacing, for criminal possession of a weapon, or for any other offense, and the Defendant Officers had said as much, out loud, on the record they themselves were creating.

**F. The Officers Refuse to Let Mr. Webster File a Criminal Complaint**

63. Having been told by the officers that Mr. Saleh was in the wrong, Mr. Webster asked the officers to take a criminal complaint against Mr. Saleh.

64. The Defendant Officers refused. They told Mr. Webster, in substance, that they would not let him file a charge against his landlord because they were not going to do all that paperwork.

65. Defendant Otwell told Mr. Webster, in substance, "nobody's pressing any charges," and that Mr. Saleh was "not wrong enough to go to jail."

66. Mr. Webster objected. He persisted in asking that a complaint be taken.

67. The refusal was not based on any assessment that Mr. Saleh's conduct was lawful. The officers had already said the opposite on camera.

**G. Mr. Webster Asks for Names and Badge Numbers; Otwell Orders the Arrest**

68. Because the officers would not take his complaint, Mr. Webster asked them for their names and badge numbers so that he could pursue the charge himself.

69. Mr. Webster remained calm. He asked repeatedly and specifically: "So you're not going to give me the badge numbers?" and "That's not your badge number, sir. I'm asking for it."

70. Defendant Otwell answered: "My name's written right here, read it."

71. Mr. Webster asked again.

72. Defendant Otwell then said: "You know what? Take him. Take him. He can talk to the detectives. You can talk to the detectives for menacing."

73. Mr. Webster asked: "For menacing my own shop?"

74. Defendant Otwell answered: "Yeah, you talked yourself into it."

75. That exchange is the whole of it. Nothing about the facts of the incident changed between the moment Defendant Otwell said no one was going to jail and the moment he said "take him." No new evidence arrived. No new witness spoke. No new allegation was made. The only intervening event was Mr. Webster's insistence on filing a complaint and his request for the officers' names and badge numbers.

76. "You talked yourself into it" is an admission of retaliatory motive in the arresting supervisor's own words, captured on the Defendants' own recording equipment. Mr. Webster would not have been arrested but for his protected speech.

**H. The Arrest, and the Officers Who Stood By**

77. On Defendant Otwell's order, Defendants Lewandowski and Massimi seized Mr. Webster. An officer grabbed him by the arm, gripped him tightly, pulled him, walked him to a police vehicle, and handcuffed him.

78. The arrest was effected at 4:43 p.m. on June 5, 2024, at 1413 Fillmore Avenue, per the Buffalo Police Department's Arrest Data Form, which records Defendant Lewandowski as the arresting officer and Defendant Massimi as the assisting officer. The New York State Division of Criminal Justice Services fingerprint response for this arrest independently records the same arrest date and time of 4:43 p.m.

79. Mr. Webster was conscious of the confinement at all times. He did not consent to it. He was not free to leave.

80. No officer advised Mr. Webster of his rights.

81. Officers Lewis and Stenzel are recorded in the Central Booking case history as having assisted in the arrest. Detective Sterlace participated by taking the complaining statement. Defendant Otwell is recorded as the supervising officer.

82. Each of these officers was present at the scene, had watched or had access to the exculpatory surveillance footage or had heard the officers' on-camera conclusion that no crime had occurred, and heard or was in a position to hear the badge-number exchange that immediately preceded the arrest order.

83. Each therefore knew that a fellow officer was effecting an arrest without probable cause and in retaliation for protected speech.

84. Each had a realistic opportunity to intervene: to decline to place hands on Mr. Webster, to tell the supervisor there was no basis, to refuse to transport, to decline to swear out a false instrument. The arrest unfolded over minutes, not seconds, in a static and non-violent setting, with no exigency of any kind.

85. None of them intervened.

86. Instead, the transporting officers told Mr. Webster words to the effect that they "would have never taken it this far," that he "clearly didn't do anything wrong," and that it was "out of our hands" once the lieutenant arrived. Those statements establish both that the officers knew the arrest was baseless and that they consciously chose not to act on that knowledge.

**I. The False Accusatory Instruments and the Buried Video**

87. At 4:45 p.m., two minutes after the arrest, Detective Sterlace took a sworn supporting deposition from Mr. Saleh at the C-District Station House, 693 East Ferry Street.

88. In that deposition Mr. Saleh claimed that he had come to the building about a leaking pipe and a plumber he could not get access for. That account is irreconcilable with the surveillance recording, in which Mr. Saleh never mentions plumbing and instead demands immediate vacatur. Mr. Webster has video of a plumber having been admitted to the building days earlier.

89. Mr. Saleh further claimed that Mr. Webster said, "You seriously wanna get your life blown away over nothing? Come on, show me, come on," and that he feared for his life. The same deposition quotes Mr. Webster telling Mr. Saleh, "You can't be in here, I'm not evicted yet, I still have 2 months," which is consistent with the court's direction that morning and with Mr. Webster's account throughout.

90. Mr. Saleh also confirmed under oath that video of the incident existed: "The video shows it, it was so quick." The video Mr. Saleh invoked is the same recording the Defendant Officers had already watched at the scene, and after watching it they stated on camera that Mr. Webster never pointed the shotgun and had the right to defend his business.

91. Defendant Lewandowski then swore out two accusatory instruments against Mr. Webster: one charging Criminal Possession of a Weapon in the Second Degree, loaded firearm, Penal Law § 265.03(1)(b), a class C felony; and one charging Menacing in the Second Degree, Penal Law § 120.14(1), a class A misdemeanor.

92. Both instruments describe the same single course of conduct. The menacing information alleges it occurred at 3:35 p.m. The weapons information alleges it occurred at 4:43 p.m., which is the recorded time of Mr. Webster's arrest, not of any confrontation. The same officer swore to two mutually exclusive times for one event.

93. Defendant Lewandowski swore that his allegations rested "upon information and belief," with the source being Mr. Saleh's supporting deposition, despite having personally watched the surveillance footage that contradicted it, and despite having stated on camera that Mr. Webster did nothing wrong.

94. While in custody, Mr. Webster told Detective Sterlace that the video of the incident was on his phone and offered to show it to her. She said she would go review it and left. She never returned. Approximately thirty-nine minutes of that interaction were recorded.

95. The exculpatory video was never presented to the arraigning court, never disclosed in the People's proffer, and never acted upon by any Defendant.

96. Mr. Webster's phone, logged into police custody on the property receipt, was then reported lost. Mr. Webster's family tracked the phone's location moving between police facilities while he was incarcerated. The phone was produced only after Mr. Webster went in person to the Buffalo Police Department's Internal Affairs division about the missing telephone and stated that the footage also existed in cloud storage. The Internal Affairs officer he spoke with walked to the property section herself and directed that the telephone be released to him.

97. The Defendants, individually and in concert, initiated and caused the continuation of a criminal prosecution they knew to be baseless, by means of sworn instruments they knew to be false, and by withholding the evidence that would have defeated it.

**J. Arraignment, $80,000 Bail, and Pretrial Confinement**

98. Mr. Webster was booked, photographed, fingerprinted, and held overnight.

99. He was arraigned the following morning, June 6, 2024, in Buffalo City Court, Part 7, before the Hon. Tiffany Perry, on Docket No. CR-04085-24.

100. The People's entire factual proffer was one sentence: "The accusatory instrument alleges that officers did recover one 12-gauge shotgun." The prosecutor then requested remand based on "the seriousness of these allegations."

101. The People made no reference to the menacing allegation, no reference to the contents of Mr. Saleh's supporting deposition, and no reference to the fact that the responding officers had viewed the store video and concluded on camera that Mr. Webster had done nothing wrong. The prosecution was operating entirely off Defendant Lewandowski's sworn instrument.

102. The court set bail at $80,000, A through E. Counsel represented that Mr. Webster could afford approximately $150 and requested $1,000.

103. Mr. Webster could not post bail. He was confined at the Erie County Holding Center from June 5, 2024 until June 11, 2024, a period of six days.

104. The court also imposed a full stay-away order of protection barring Mr. Webster from Mr. Saleh's "place of business." Because Mr. Saleh's place of business was the building Mr. Webster rented, that order locked Mr. Webster out of Buffalo Turtle Zoo and away from more than fifty animals in his sole care.

105. Mr. Webster's post-arraignment restraints on liberty were severe and continuous: incarceration he could not buy his way out of; an order of protection excluding him from his own business; a firearm surrender order; and mandatory court appearances in a felony prosecution that ran from June 5 to November 4, 2024.

106. Mr. Webster attended every court date. When the court expressly offered to excuse his appearance and said it would not be held against him, he answered, "I'll be here."

**K. Exclusion from the Business, Firearm Surrender, and the ERPO**

107. On June 11, 2024, the order of protection was narrowed to permit Mr. Webster access to the business, six days after his animals had been left without their keeper.

108. On June 13, 2024, Mr. Webster appeared for a hearing at which he testified under oath. He told the court he had more than fifty animals and that if he could not access the store, "They would die."

109. The court found that Mr. Webster "does have a significant property interest" and modified the order of protection to nonoffensive contact only, over the People's objection. The court observed on the record that Mr. Webster had no priors and had never been arrested for anything.

110. The Buffalo Police Department commenced a proceeding under CPLR Article 63-A in Supreme Court, Erie County, Index No. 600329/2024, before the Hon. Paula L. Feroleto, J.S.C.

111. Mr. Webster surrendered all three of his lawfully owned firearms: the shotgun seized at the scene, the Smith & Wesson M&P 15-22, and the Aero Precision M16A4. Mr. Webster consented to entry of a final Extreme Risk Protection Order on June 13, 2024. His firearms license was suspended.

112. Every one of these consequences, the felony charge, the $80,000 bail, the six days in custody, the exclusion from his business, the loss of his firearms and his license, flowed from the accusatory instruments the Defendant Officers swore out after concluding on camera that Mr. Webster had committed no crime.

113. The Buffalo Police Department retained all three firearms until at least October 6, 2025, when Justice Feroleto, finding no lawful impediment to Mr. Webster's possession of them, ordered the Department to return them.

**L. The People Abandon the Weapons Charge**

114. On July 29, 2024, the People moved under CPL § 180.50 to reduce the class C felony weapons count to Criminal Possession of a Weapon in the Fourth Degree, and in the same breath moved to dismiss the reduced charge.

115. All weapons charges were gone as of July 29, 2024, fifty-four days after the arrest. There was no plea, no decided motion, and no witness testified at a felony hearing. Probable cause for the charge that drove the $80,000 bail and Mr. Webster's incarceration was never tested, because the People walked away from it rather than defend it.

116. Only the Menacing in the Second Degree count survived.

117. The People offered Mr. Webster a plea to attempted menacing, a class B misdemeanor. He declined.

118. Probable cause must be analyzed charge by charge. As to the felony weapons count, the People's own voluntary dismissal without ever presenting evidence is powerful evidence that none existed. As to the menacing count, the responding officers' recorded statements that Mr. Webster never pointed the weapon and had the right to defend his business negate the intent element on the face of the Defendants' own evidence.

**M. Dismissal and Favorable Termination**

119. After the reduction, the People filed a Certificate of Compliance that was defective on its face: it contained only odd-numbered pages.

120. Defense counsel raised the defect by notice of motion dated September 17, 2024 and again on the record on October 28, 2024, stating that the case was "speedy trial dead." The People never cured it.

121. The prosecution passed through three assistant district attorneys in five months. At the October 28 appearance, the court declined to let a covering prosecutor argue, observing that it could not have "a covering ADA who just picked up the file probably on this morning."

122. On November 4, 2024, the court dismissed the entire prosecution pursuant to CPL § 30.30, over the People's objection, stating: "Matter's 30.30 dead. Matter is dismissed pursuant to 30.30." The assistant district attorney conceded the defect on the record.

123. Mr. Webster rejected an offered twelve-month adjournment in contemplation of dismissal. He took no plea, accepted no conditions, and admitted nothing.

124. The criminal proceeding against Mr. Webster therefore ended without a conviction on November 4, 2024, which constitutes a favorable termination.

125. Neither Mr. Saleh nor any Defendant Officer ever appeared at a single one of Mr. Webster's criminal court dates.

126. At the final appearance, the People did not defend probable cause at all. The prosecutor's position was that "there's a credibility determination at the point where the defendant keeps arguing with the officers," and he conceded that no part of the defense motion spoke to the actual elements of the charge.

**N. Selective Enforcement: Two Men, One Incident, One Arrest**

127. Mr. Webster is Black. Mr. Saleh is not.

128. Two men were present at the same incident, at the same place, at the same time, and were assessed by the same officers on the same facts and the same video.

129. The Defendant Officers concluded on camera that Mr. Saleh, who had entered a tenant's business with no legal authority, screamed threats including "I'll fuck you up like a bitch," and refused to leave, was "wrong," but "not wrong enough to go to jail."

130. The Defendant Officers also concluded on camera that Mr. Webster had done nothing wrong and that no one was going to jail.

131. Mr. Webster asked that a complaint be taken against Mr. Saleh and was refused. Mr. Saleh's complaint against Mr. Webster was taken, reduced to a sworn deposition, and converted into a felony charge within two hours.

132. Of the two men, only the Black man was arrested. Only the Black man was charged. Only the Black man spent six days in a holding cell, lost his firearms, and was excluded from his own business.

**O. The City's Own Arrest Data**

133. On information and belief, the facts in this section are drawn from records the City of Buffalo produced to Plaintiff's counsel in response to a request under the New York Freedom of Information Law, Public Officers Law Article 6, designated by the City as FOIL No. 26-5006. The production consists of a Buffalo Police Department arrest-charge export covering arrests from January 2019 through September 2026 on charges of Menacing (Penal Law Article 120) and Criminal Possession of a Weapon (Penal Law Article 265), the same two offense categories charged against Mr. Webster.

134. The export contains 338 charge records corresponding to 259 distinct arrests citywide.

135. Citywide, the City's own data shows no meaningful difference between the number of Black and white persons arrested on these charges. Of the 259 arrests, 84 arrestees are recorded as Black and 87 as white, a ratio of approximately 0.97 to 1.

136. C District is different. Of the 55 arrests recorded in C District, 23 arrestees are recorded as Black and 14 as white, a ratio of approximately 1.64 to 1. Expressed as a share of the arrests in which race was recorded as Black or white, Black arrestees account for approximately 62% of C-District arrests on these charges.

137. In every other Buffalo police district combined, the same figures run the opposite way: of 203 arrests, 60 arrestees are recorded as Black and 73 as white, a ratio of approximately 0.82 to 1.

138. C District is therefore an outlier within the City's own records. A Black person arrested in Buffalo for menacing or criminal possession of a weapon is roughly twice as likely, relative to a white person, to have been arrested in C District as in any other district in the City. C District is the district that arrested Mr. Webster, and Defendant Lewandowski was assigned to it.

139. The same production also establishes that the Buffalo Police Department does not reliably record the race of the people it arrests. Of the 259 arrests, 41 contain no race entry at all, and a further 43 are coded with non-standard values ("X," "R," or "U") that identify no race. In total, the race of the arrestee cannot be determined from the City's own records in approximately 32% of these arrests.

140. The charge combination used against Mr. Webster is rare. Of the 259 arrests in the production, only 30 citywide, and only 5 in C District, involved both a Menacing charge and a Criminal Possession of a Weapon charge arising from the same arrest.

141. Plaintiff's FOIL request also sought, and the City did not produce: any identifier permitting these arrests to be sorted by whether they arose from a landlord-tenant dispute; the

race or ethnicity of complainants and victims, as distinct from arrestees; and records of instances in which officers declined to accept a criminal complaint, together with the associated Internal Affairs and Citizens' Police Review Board files. Those categories remain outstanding. Plaintiff expects that the City's own records will permit a more precise comparison once they are produced in discovery.

142. The differential treatment of Mr. Webster was motivated by his race and by his insistence on being treated as the complainant rather than the suspect.

**P. Municipal Policy, Custom, and Failure to Train**

143. Defendant Otwell was the ranking officer at the scene. He gave the order to arrest. The subordinate officers understood that order as binding and told Mr. Webster it was "out of our hands" once the lieutenant arrived.

144. At all relevant times, Buffalo Police Commissioner Joseph A. Gramaglia was responsible for the hiring, training, supervision, discipline, and conduct of the Defendant Officers, and for setting, reviewing, and enforcing the policies and regulations of the Buffalo Police Department.

145. Prior to June 5, 2024, the City developed and maintained policies, customs and practices exhibiting deliberate indifference to the constitutional rights of persons in the City of Buffalo, which caused the violation of Mr. Webster's rights.

146. Upon information and belief, the City maintained a policy, custom, or practice of retaliating against individuals who lawfully object to police action, who seek to file complaints against officers, or who behave in a manner officers perceive as disrespectful.

147. That custom is what Mr. Webster encountered. He objected lawfully. He asked to file a complaint. He asked for names and badge numbers. He was arrested on a felony within minutes, by the same officers who had just concluded on camera that he had done nothing wrong.

148. Upon information and belief, the City maintained a further custom of declining to accept criminal complaints from members of the public against persons the officers preferred not to charge, and of treating a complainant's persistence as grounds for arrest.

149. The City failed to train its officers that a civilian's request for an officer's name or badge number is protected by the First Amendment and cannot supply grounds for arrest; that a refusal to accept a citizen complaint may not be enforced by arrest; that exculpatory video reviewed at the scene must be preserved and disclosed rather than omitted from the charging instrument; and that an officer may not swear to facts he has personally seen to be false.

150. The need for that training was obvious. An entire shift, two patrol officers, a detective and a lieutenant, treated a badge-number request as grounds for a class C felony arrest, and did so minutes after stating the opposite conclusion on camera. That is not an individual lapse; it is training and supervision.

151. The City had actual notice of the risk. In McNeil v. The City of Buffalo, No. 1:20-cv-00998 (W.D.N.Y.), the plaintiff alleged that Buffalo Police officers arrested him on a fabricated drug charge after he said he wished to file a complaint about their conduct during a traffic stop. Upon information and belief, in or about March 2026 the City's law department sought approval of a settlement of that action in the sum of $700,000. The allegations, proceedings and outcome in McNeil are probative of notice, of recurring accusations of

materially similar misconduct, and of the City's awareness of the risk that its officers were arresting citizens in retaliation for attempting to complain.

152. In Kistner v. The City of Buffalo, No. 1:18-cv-00402 (W.D.N.Y.), involving officers of the same C District that arrested Mr. Webster, this Court denied the City summary judgment on Monell liability in 2022. The Court identified, among other things, that Internal Affairs did not open an investigation until more than two and a half years after the plaintiff's notice of claim; that a Department spokesperson incorrectly stated that an investigation had already begun; that none of the five officers at the scene was disciplined despite identified departures from Department policy; and that the Commissioner did not adequately investigate missing documentation. The Court held that those failures, taken together, permitted an inference of ratification or deliberate indifference.

153. The City's disciplinary record confirms the pattern. Upon information and belief, and based on the New York Civil Liberties Union's September 2024 analysis of Buffalo Police disciplinary records released following the repeal of Civil Rights Law § 50-a, covering 1995 through 2023: the records reflect 934 unique misconduct allegations, of which only 86, approximately 9.2%, were sustained; of 157 allegations concerning use of force or excessive force, only two were substantiated; of 31 weapon-use allegations, one was substantiated; 272 officers appear in at least one disciplinary record and 27 appear in ten or more; and among the 86 sustained allegations the recorded discipline consisted of 38 reprimands and 28 suspensions of at least one day, with no terminations.

154. Upon information and belief, the same analysis found that the Buffalo Police Department had not maintained a systematic complaint and misconduct database, and that the

disciplinary history had to be reconstructed by hand from disciplinary cards, Internal Affairs memoranda, and employee-history records. A department that does not track misconduct cannot detect patterns in it.

155. The City has also been on notice of allegations of racially disparate enforcement by its police department for years. In Black Love Resists in the Rust v. City of Buffalo, No. 1:18-cv-00719 (W.D.N.Y.), pending in this District since 2018, plaintiffs allege that the Department concentrated enforcement in predominantly Black and Latino neighborhoods. Upon information and belief, the summary-judgment record in that case includes expert analysis of Department traffic-enforcement data finding that, after accounting for violent crime, high-minority census tracts averaged more than six times as many checkpoints as comparable low-minority tracts, a difference significant at the one-percent level. On May 29, 2026, this Court declined to grant the City summary judgment on equal-protection claims arising from that record.

156. Upon information and belief, the record in Black Love further reflects that, from 2012 forward, at least 123 people filed 126 Internal Affairs complaints against the Department alleging racial discrimination. Plaintiff pleads these as allegations made to the City, not as adjudicated findings; their significance is that the City received them.

157. Upon information and belief, a 2023 analysis of the City's own published traffic-stop receipt data for June 2020 through June 2023 found that Black drivers received stop receipts at approximately 3.1 times the rate of white drivers relative to population, that more than half of all receipts were issued to Black drivers although Black residents are approximately one-third of Buffalo's population, and that race was missing or improperly recorded in 22% of receipts. The same failure to record race appears in the arrest data the City produced in this matter.

158. The City knew what its own policy required. Upon information and belief, the Buffalo Police Department's published general order on use of force imposes an affirmative duty to intervene when an officer has a realistic opportunity to prevent objectively unreasonable force, prohibits the use of force against persons engaged in First Amendment protected activity or as punishment, and requires Internal Affairs to conduct an annual review for patterns or trends warranting changes in training or policy. The conduct alleged here departed from the City's own written requirements, and no officer was disciplined for it.

159. Mr. Webster's own experience supplies a further instance. He raised the handling of his property with the Department's Internal Affairs division, and an Internal Affairs officer had to intervene in person before the telephone was released to him. No officer was disciplined in connection with his arrest, the sworn instruments, or his property. The prosecution against him was dismissed outright, and still no review followed.

160. The City ratified and acquiesced in the conduct of the Defendant Officers, as evidenced by its failure to investigate or discipline them, and by its failure to review the arrest even after the criminal charges were dismissed under CPL § 30.30.

161. As a direct and proximate result of the City's policies, customs and practices, Mr. Webster was damaged and injured in an amount to be determined at trial.

**Q. The Property Room: The Phone, and Sixteen Months Without His Firearms**

162. Mr. Webster's cellular telephone was taken from him at booking and logged on the Buffalo Police Department prisoner's property receipt, together with his driver's license, shoelaces, two necklaces, miscellaneous papers, and $3.00 in cash.

163. That telephone held the surveillance footage of the June 5, 2024 incident, the evidence that disproved the charges the Defendant Officers had sworn out.

164. While Mr. Webster was confined, members of his family attempted repeatedly, on consecutive days, to retrieve his property from the Buffalo Police Department. Every item was accounted for except the telephone.

165. Department personnel told Mr. Webster's family, variously, that the phone could not be located, that they should come back, and eventually that they should stop coming. At one point the Department asserted that his property had been released to another inmate, an account irreconcilable with the fact that every other item was returned to him intact.

166. A Buffalo Police Department employee took Mr. Webster's family into a hallway, told them the situation did not seem right, advised them to obtain a lawyer immediately, and told them not to retain one "from down here."

167. Mr. Webster's family tracked the telephone's location while he was incarcerated. The device moved between Buffalo Police Department facilities, from the district station toward headquarters and then to another building downtown, at a time when Mr. Webster was in custody and could not have been carrying it.

168. The telephone was produced only after Mr. Webster went in person to the Department's Internal Affairs division, described the tracking evidence, and stated that the footage was also stored in the cloud and could be retrieved from any device. The Internal Affairs officer to whom he spoke walked directly to the property section and directed that the telephone be released to him. Within roughly twenty minutes, the telephone was located and returned.

What the property section had told Mr. Webster and his family for days it could not find was produced in minutes once an officer of the Department asked for it.

169. No Buffalo Police officer has been disciplined in connection with Mr. Webster's arrest, the charges sworn against him, or the handling of his property.

170. Separately, the Buffalo Police Department held Mr. Webster's three lawfully owned firearms from June 2024 until at least October 2025, approximately sixteen months. The Tri Star shotgun was seized at the scene on June 5, 2024. The Smith & Wesson M&P 15-22 and the Aero Precision M16A4 were surrendered at the Department's property division, 68 Court Street, on June 13, 2024 at 1:52 p.m., and logged on Buffalo Police Department form P-10A.

171. Mr. Webster, without counsel, applied to the Supreme Court for the return of his firearms in July 2025. His application was returned to him unfiled for failure to serve the Buffalo Police Department and the Erie County Pistol Permit Office.

172. On October 6, 2025, the court found no lawful impediment to Mr. Webster's possession of the firearms, recorded that no objection had been received from any noticed party, and ordered the Buffalo Police Department to return all three weapons.

**R. Injuries and Damages**

173. Mr. Webster was seized, handcuffed, transported, booked, photographed, fingerprinted, and confined against his will.

174. He was held at the Erie County Holding Center for six days, from June 5 through June 11, 2024, on $80,000 bail he could not pay, on a class C felony the People abandoned without ever defending it.

175. He was barred by court order from his own place of business while more than fifty animals in his sole care went untended.

176. He surrendered three lawfully owned firearms and his firearms license, and was without them for approximately sixteen months.

177. He defended a criminal prosecution for five months, attending every appearance, until it was dismissed without a conviction.

178. Buffalo Turtle Zoo closed. Its last day at 1413 Fillmore Avenue was August 4, 2024. The Defendants destroyed Mr. Webster's ability to wind the business down in an orderly way: they removed him from the premises during the sixty days the court had given him to rehome the animals, and the order of protection obtained on the strength of their charges kept him out.

179. Mr. Webster suffers continuing psychological injury: recurring nightmares of officers standing over him, intrusive replaying of the arrest, panic, hypervigilance, and fear of leaving his home. He is afraid to call the police for help even when he is the victim, a direct and lasting consequence of having been arrested for asking officers to do their job.

180. He was publicly arrested at his own storefront, in the neighborhood his business served, and was held out as a man who had pointed a loaded shotgun at another person. He suffered damage to his reputation and standing in that community.

181. Mr. Webster was thirty-eight years old, working, and taxpaying. He lost his liberty, his business, his firearms, and his peace of mind because he asked a police officer for a badge number.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS
**False Arrest, False Imprisonment, and Unlawful Pretrial Detention under 42 U.S.C. § 1983**
**Against Defendants Otwell, Lewandowski and Massimi**

182. Mr. Webster repeats and realleges each and every allegation set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

183. At all relevant times, Defendants Otwell, Lewandowski and Massimi acted under color of state law, as police officers employed by the City of Buffalo.

184. The Fourth Amendment, applicable to the States through the Fourteenth Amendment, guarantees Mr. Webster the right to be free from unreasonable seizures, including arrest and pretrial detention without probable cause.

185. On June 5, 2024, at approximately 4:43 p.m., at 1413 Fillmore Avenue, these Defendants intended to confine Mr. Webster and did confine him. On Defendant Otwell's order, Defendants Lewandowski and Massimi seized Mr. Webster, walked him to a police vehicle, and handcuffed him, with the assistance of Officers Lewis and Stenzel.

186. Mr. Webster was conscious of the confinement at all times.

187. Mr. Webster did not consent to the confinement.

188. The confinement was not otherwise privileged. No warrant authorized it, and no probable cause supported it.

189. No reasonable officer could have believed that probable cause existed to arrest Mr. Webster for Criminal Possession of a Weapon in the Second Degree. Mr. Webster possessed a

lawfully owned shotgun inside his own place of business; the Defendants themselves confirmed on camera that the firearm was legally owned; and nothing in the store's surveillance video, or in anything else known to the Defendants, suggested that Mr. Webster possessed the shotgun with intent to use it unlawfully against another.

190. No reasonable officer could have believed that probable cause existed to arrest Mr. Webster for Menacing in the Second Degree. Having watched the store's surveillance video, the Defendants stated on their own body-worn cameras that Mr. Webster never pointed the shotgun at Mr. Saleh, that he told Mr. Saleh only to leave his business, and that he had the right to defend his business.

191. Minutes before ordering the arrest, Defendant Otwell announced that "no one's going to jail." Nothing about the facts of the incident changed between that statement and his order to "take him." No new evidence arrived, and no new witness spoke. The only intervening event was Mr. Webster's request for the officers' names and badge numbers.

192. Mr. Saleh's accusation did not supply probable cause. His sworn supporting deposition was not taken until 4:45 p.m., two minutes after the arrest. At the moment of arrest the Defendants had already tested the competing accounts against the video and had credited Mr. Webster's. An officer may not close his eyes to exculpatory evidence in his possession and rely on a complainant's account he has already rejected.

193. Mr. Webster remained in the Defendants' custody from his arrest until his arraignment on the morning of June 6, 2024.

194. Mr. Webster's detention did not become lawful when legal process issued. The process itself rested on the two accusatory instruments Defendant Lewandowski swore out, and those instruments were false and misleading in material respects:

(a) Both alleged that Mr. Webster "did brandish the weapon in a manner that made the victim fearful of life," although the Defendants had watched video showing that he never pointed the shotgun at anyone;

(b) The two instruments alleged two different times, 3:35 p.m. and 4:43 p.m., for the same single course of conduct, the later of which is the recorded time of Mr. Webster's arrest; and

(c) Neither disclosed that the responding officers had viewed the store's surveillance video at the scene and had concluded, on camera, that Mr. Webster had done nothing wrong.

195. Defendant Lewandowski swore that his allegations rested "upon information and belief," with Mr. Saleh's supporting deposition as their only source, despite having personally watched the surveillance video that contradicted that deposition. An officer who forwards information he knows to be false to prosecutors violates the Constitution, and the intervening acts of the prosecutor and the court do not break the causal chain.

196. Defendant Otwell ordered the arrest and supervised the case, and Defendant Massimi apprehended Mr. Webster and submitted the shotgun into evidence in support of the charges. Each Defendant is sued for his own conduct.

197. Because Mr. Webster could not post the $80,000 bail set on the strength of those instruments, he was detained at the Erie County Holding Center from June 5 until June 11, 2024. Absent the false and misleading instruments there was no basis to detain him at all.

198. At no point during Mr. Webster's arrest or detention did probable cause exist to support it.

199. By reason of the foregoing, Defendants Otwell, Lewandowski and Massimi deprived Mr. Webster of rights, privileges and immunities secured by the Fourth and Fourteenth Amendments, in violation of 42 U.S.C. § 1983.

200. As a direct and proximate result of the foregoing, Mr. Webster suffered a loss of liberty, humiliation, emotional distress, damage to his reputation and business, and other injuries, and was damaged in an amount to be determined at trial.

201. The aforesaid conduct of Defendants Otwell, Lewandowski and Massimi was willful, malicious, oppressive, and/or reckless, and was of such a nature that Mr. Webster claims punitive damages against each of them in an amount commensurate with the wrongful acts alleged herein.

## SECOND CLAIM FOR RELIEF

## VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS

### Malicious Prosecution under 42 U.S.C. § 1983

### Against Defendants Otwell, Lewandowski and Massimi

202. Mr. Webster repeats and realleges each and every allegation set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

203. At all relevant times, Defendants Otwell, Lewandowski and Massimi acted under color of state law.

204. These Defendants commenced a criminal proceeding against Mr. Webster. Defendant Lewandowski swore out both accusatory instruments; Defendant Otwell directed that Mr. Webster be arrested and charged with "menacing"; both instruments relied expressly on the supporting deposition Detective Sterlace obtained from Mr. Saleh; and Defendant Massimi apprehended Mr. Webster and submitted into evidence the shotgun on which the weapons count rested. These Defendants forwarded the instruments to the Erie County District Attorney and to Buffalo City Court.

205. These Defendants continued the proceeding by withholding from the prosecution and the court the exculpatory video they had viewed, the conclusions they had stated on camera, and the known contradictions between Mr. Saleh's account and the recorded events.

206. There was no probable cause for either charge, analyzed charge by charge:

(a) Criminal Possession of a Weapon in the Second Degree, Penal Law § 265.03(1)(b), requires possession of a loaded firearm with intent to use it unlawfully against another. No fact known to the Defendants supported such intent. They knew Mr. Webster lawfully owned the shotgun, kept it in his own place of business, and retrieved it only after being cornered and threatened. On July 29, 2024, the People reduced this count and moved to dismiss it without ever presenting evidence in support of it.

(b) Menacing in the Second Degree, Penal Law § 120.14(1), requires that a person intentionally place or attempt to place another in reasonable fear of physical injury by displaying a deadly weapon. The Defendants had watched video showing that Mr.

Webster never pointed the shotgun at Mr. Saleh, and had stated on camera that he had the right to defend his business and that no one was going to jail. Mr. Saleh himself swore that "[t]he video shows it."

207. The Defendants acted with actual malice. They initiated the prosecution for a purpose other than bringing an offender to justice: to punish Mr. Webster for asking for their names and badge numbers and for insisting that a complaint be taken against Mr. Saleh. Defendant Otwell stated that purpose in his own words: "Yeah, you talked yourself into it." Malice may further be inferred from the complete absence of probable cause.

208. The prosecution terminated in Mr. Webster's favor. On November 4, 2024, Buffalo City Court dismissed the entire prosecution pursuant to CPL § 30.30, over the People's objection. Mr. Webster entered no plea of guilty, rejected an offered adjournment in contemplation of dismissal, accepted no conditions, and admitted nothing. The prosecution ended without a conviction, which is all that the favorable-termination element requires.

209. As a result of the prosecution, Mr. Webster suffered a post-arraignment deprivation of liberty implicating the Fourth Amendment, including $80,000 bail he could not post; six days of confinement at the Erie County Holding Center, from June 5 through June 11, 2024; an order of protection excluding him from his own place of business; the surrender of his firearms; and compulsory appearances in Buffalo City Court over five months.

210. By reason of the foregoing, these Defendants deprived Mr. Webster of rights secured by the Fourth and Fourteenth Amendments, in violation of 42 U.S.C. § 1983.

211. As a direct and proximate result of the foregoing, Mr. Webster suffered a loss of liberty, humiliation, emotional distress, damage to his reputation and business, and other injuries, and was damaged in an amount to be determined at trial.

212. The aforesaid conduct of these Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that Mr. Webster claims punitive damages against each of them in an amount commensurate with the wrongful acts alleged herein.

## THIRD CLAIM FOR RELIEF

## CONSPIRACY TO VIOLATE CIVIL RIGHTS

### Conspiracy under 42 U.S.C. § 1983

### Against All Defendants Except the City of Buffalo

213. Mr. Webster repeats and realleges each and every allegation set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

214. Defendants Saleh and John Doe ("AK") are private persons. By willfully participating in joint activity with the Defendant Officers to bring about Mr. Webster's arrest and prosecution, they acted under color of state law.

215. Upon information and belief, after Mr. Webster asked for the officers' names and badge numbers and insisted that a complaint be taken against Mr. Saleh, the Defendant Officers and Defendant Saleh reached an agreement, express or tacit, to have Mr. Webster arrested and charged, and to supply a sworn account that would support charges the Defendant Officers knew the video contradicted.

216. That agreement is shown by, among other things, the following:

(a) The Defendant Officers refused to take Mr. Webster's complaint against Mr. Saleh, but took Mr. Saleh's complaint against Mr. Webster;

(b) Defendant Otwell told Mr. Webster that "nobody's pressing any charges" because "they want to press charges against you," showing that the officers had already consulted with Mr. Saleh's side about charging Mr. Webster;

(c) Detective Sterlace took Mr. Saleh's sworn supporting deposition at the C-District Station House at 4:45 p.m., two minutes after the arrest;

(d) In that deposition Mr. Saleh gave an account, including that he had come about a leaking pipe and that Mr. Webster threatened his life, that the store's surveillance video contradicts and that the Defendant Officers had already rejected on camera;

(e) Defendant Lewandowski adopted Mr. Saleh's deposition as the sole stated source of both accusatory instruments; and

(f) Having secured the charges, neither Mr. Saleh nor any Defendant Officer appeared at a single one of Mr. Webster's court dates.

217. Upon information and belief, Defendant Doe participated in the agreement, including by accompanying Mr. Saleh, holding the papers Mr. Saleh used to demand that Mr. Webster vacate, placing or joining the call to police at Mr. Saleh's direction, and supporting Mr. Saleh's account to the responding officers.

218. In furtherance of the agreement the Defendants committed overt acts, including the arrest, the taking and giving of the supporting deposition, the swearing of the accusatory instruments, and the withholding of the exculpatory video.

219. The conspiracy caused the deprivations of Mr. Webster's rights under the First, Fourth, and Fourteenth Amendments alleged in the First, Second, Fourth, and Sixth Claims for Relief.

220. As a direct and proximate result of the foregoing, Mr. Webster suffered a loss of liberty, humiliation, emotional distress, damage to his reputation and business, and other injuries, and was damaged in an amount to be determined at trial.

221. The aforesaid conduct of these Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that Mr. Webster claims punitive damages against each of them in an amount commensurate with the wrongful acts alleged herein.

**FOURTH CLAIM FOR RELIEF**

**VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS**
**First Amendment Retaliation and Retaliatory Arrest under 42 U.S.C. § 1983**
**Against the Defendant Officers**

222. Mr. Webster repeats and realleges each and every allegation set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

223. At all relevant times, the Defendant Officers acted under color of state law.

224. Mr. Webster engaged in activity protected by the First Amendment, applicable to the States through the Fourteenth Amendment. He asked the officers to take a criminal complaint against Mr. Saleh; he objected when they refused; and he asked, repeatedly and peacefully, for their names and badge numbers so that he could pursue the complaint himself. The First Amendment protects the right to criticize police officers and to seek their identifying information, and that right is clearly established.

225. Mr. Webster's speech was peaceful and lawful. He made no threat, did not obstruct the officers, and offered no physical resistance.

226. The Defendant Officers took adverse action against Mr. Webster: they arrested him, charged him with a class C felony and a class A misdemeanor, and caused him to be prosecuted for five months. That action would deter a person of ordinary firmness from exercising First Amendment rights, and it in fact deterred Mr. Webster, who now fears calling the police even when he is the victim.

227. Mr. Webster's protected speech was a but-for cause of the arrest and of the decision to charge him. Before his request for names and badge numbers, Defendant Otwell had announced that "no one's going to jail." Immediately after it he ordered: "Take him. Take him.... You can talk to the detectives for menacing." When Mr. Webster asked, "For menacing my own shop?", Defendant Otwell answered: "Yeah, you talked yourself into it."

228. The arrest and the ensuing prosecution each lacked probable cause, for the reasons alleged in the First and Second Claims for Relief.

229. In the alternative, and independently, Mr. Webster can present objective evidence that officers do not ordinarily arrest persons who have engaged in the same conduct but not the same protected speech. Mr. Saleh was present at the same incident, at the same place and time, was captured on the store's video threatening Mr. Webster, and was assessed by the same officers as "wrong." He did not ask for names or badge numbers, and he was neither arrested nor charged. The Defendant Officers themselves had decided to arrest no one until Mr. Webster spoke. Such evidence need not consist of virtually identical and identifiable comparators; it need only be objective.

230. By reason of the foregoing, the Defendant Officers deprived Mr. Webster of rights secured by the First and Fourteenth Amendments, in violation of 42 U.S.C. § 1983.

231. As a direct and proximate result of the foregoing, Mr. Webster suffered a loss of liberty, humiliation, emotional distress, damage to his reputation and business, and other injuries, and was damaged in an amount to be determined at trial.

232. The aforesaid conduct of the Defendant Officers was willful, malicious, oppressive, and/or reckless, and was of such a nature that Mr. Webster claims punitive damages against each of them in an amount commensurate with the wrongful acts alleged herein.

## FIFTH CLAIM FOR RELIEF

## VIOLATION OF THE FIRST, FOURTH AND FOURTEENTH AMENDMENTS

### Failure to Intervene under 42 U.S.C. § 1983

### Against the Defendant Officers

233. Mr. Webster repeats and realleges each and every allegation set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

234. At all relevant times the Defendant Officers acted under color of state law, and each had an affirmative duty to intervene to protect Mr. Webster's constitutional rights from infringement by other officers in his presence.

235. As alleged in the First, Second, and Fourth Claims for Relief, Mr. Webster's constitutional rights were violated by his unjustified arrest, detention and prosecution.

236. Each Defendant Officer observed, or had reason to know, that those violations were occurring. Each was present at the scene or at the C-District Station House; each had watched or had access to the exculpatory surveillance video, or had heard the officers' on-camera conclusion

that Mr. Webster had done nothing wrong; and each heard, or was in a position to hear, the badge-number exchange that immediately preceded the arrest order.

237. The officers who transported Mr. Webster told him, in substance, that they "would have never taken it this far," that he "clearly didn't do anything wrong," and that it was "out of our hands" once the lieutenant arrived.

238. Each Defendant Officer had a realistic opportunity to intervene. The arrest unfolded over minutes, not seconds, in a static, non-violent setting with no exigency. Each could have declined to place hands on Mr. Webster, told the supervisor there was no basis for the arrest, declined to transport him, or declined to swear to or forward charges contradicted by the video. Deference to a superior officer's order does not excuse the failure.

239. None of the Defendant Officers intervened.

240. This claim is pleaded in the alternative as to each Defendant Officer who is found not to have directly participated in the violations alleged above.

241. As a direct and proximate result of the foregoing, Mr. Webster suffered a loss of liberty, humiliation, emotional distress, damage to his reputation and business, and other injuries, and was damaged in an amount to be determined at trial.

242. The aforesaid conduct of the Defendant Officers was willful, malicious, oppressive, and/or reckless, and was of such a nature that Mr. Webster claims punitive damages against each of them in an amount commensurate with the wrongful acts alleged herein.

**SIXTH CLAIM FOR RELIEF**

**VIOLATION OF THE FOURTEENTH AMENDMENT**
**Equal Protection: Selective Enforcement under 42 U.S.C. § 1983**
**Against Defendants Otwell, Lewandowski and Massimi**

243. Mr. Webster repeats and realleges each and every allegation set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

244. At all relevant times, Defendants Otwell, Lewandowski and Massimi acted under color of state law.

245. The Equal Protection Clause prohibits the selective enforcement of the law based on impermissible considerations, including race. A plaintiff states such a claim by alleging that, compared with others similarly situated, he was selectively treated, and that the selective treatment was motivated by an impermissible consideration.

246. Mr. Webster and Mr. Saleh were similarly situated in all material respects. They were the two participants in the same incident, at the same place and at the same time; they were assessed by the same officers on the same evidence, including the same video; each accused the other of criminal conduct arising from that single encounter; and each asked the officers to treat the other as the wrongdoer. There is no closer comparator than the other party to the same cross-complaint.

247. The Defendants' own on-camera assessment placed Mr. Saleh, not Mr. Webster, in the wrong: Mr. Saleh had entered a tenant's business without legal authority, screamed threats, and refused to leave, while Mr. Webster "had the right to defend his business."

248. The Defendants nonetheless treated the two men differently. They refused Mr. Webster's complaint and took Mr. Saleh's. They reduced Mr. Saleh's account to a sworn

deposition and converted it into a felony charge within two hours. They arrested and charged Mr. Webster, and they neither arrested nor charged Mr. Saleh.

249. Mr. Webster is Black. Mr. Saleh is not.

250. Upon information and belief, the Defendants' differential treatment was motivated by Mr. Webster's race and by an intent to punish him for exercising his First Amendment rights. That motive is supported by the Defendants' abrupt departure from their own stated decision that no one would be arrested; by the absence of any change in the facts before that departure; by Defendant Otwell's statement that Mr. Webster had "talked himself into it"; and by the pattern evident in the City's own arrest data pleaded at Paragraphs 133 through 141, which shows that C District, the district that arrested Mr. Webster, departs from every other district in the City in the racial composition of its arrests for these two offenses.

251. Discriminatory purpose, not the mechanical identification of a comparator, is the ultimate question.

252. By reason of the foregoing, these Defendants deprived Mr. Webster of the equal protection of the laws guaranteed by the Fourteenth Amendment, in violation of 42 U.S.C. § 1983.

253. As a direct and proximate result of the foregoing, Mr. Webster suffered a loss of liberty, humiliation, emotional distress, damage to his reputation and business, and other injuries, and was damaged in an amount to be determined at trial.

254. The aforesaid conduct of these Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that Mr. Webster claims punitive damages against each of them in an amount commensurate with the wrongful acts alleged herein.

## SEVENTH CLAIM FOR RELIEF

## MUNICIPAL LIABILITY

### Monell Liability under 42 U.S.C. § 1983

### Against Defendant City of Buffalo

255. Mr. Webster repeats and realleges each and every allegation set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

256. Defendant City of Buffalo is a municipal corporation and a "person" within the meaning of 42 U.S.C. § 1983. The Buffalo Police Department is an agency of the City, and the Defendant Officers were at all relevant times employed by the City and acting within the scope of that employment.

257. The deprivations alleged herein were caused by an official policy or custom of the City of Buffalo: by a practice so persistent and widespread as to carry the force of law, by the acts of final policymakers, and by a failure to train, supervise and discipline amounting to deliberate indifference. The City's persistent failure to discipline officers responsible for such conduct ratified it.

258. As alleged in the First, Second, Fourth, Fifth and Sixth Claims for Relief, the Defendant Officers deprived Mr. Webster of rights secured by the First, Fourth and Fourteenth Amendments.

259. Those deprivations were caused by policies, customs and practices of the City of Buffalo, including:

(a) A custom and practice of retaliating against individuals who lawfully object to police action, who seek to file complaints against officers or others, who request officers' names and badge numbers, or who behave in a manner officers perceive as disrespectful;

(b) A custom and practice of declining to accept criminal complaints from members of the public against persons the officers prefer not to charge, and of treating a complainant's persistence as grounds for arrest;

(c) A custom and practice of initiating charges on a complainant's account while omitting from the charging instrument exculpatory video that officers viewed at the scene;

(d) A custom and practice of enforcing the law differently on the basis of race, including in C District; and

(e) A custom and practice of failing to investigate and discipline officers who engage in such conduct.

260. These customs and practices were so persistent and widespread as to constitute the City's standard operating procedure and to carry the force of law. This is not a case resting on a single incident. The pattern is shown by, among other things:

(a) McNeil v. The City of Buffalo, No. 1:20-cv-00998 (W.D.N.Y.), alleging a retaliatory arrest of a Buffalo man who said he wished to complain about officers' conduct, which the City moved to settle for $700,000 in or about March 2026;

(b) Kistner v. The City of Buffalo, No. 1:18-cv-00402 (W.D.N.Y.), in which this Court in 2022 denied the City summary judgment on municipal liability based on C-District officers' conduct, a two-and-a-half-year delay in opening an Internal Affairs investigation, and the absence of discipline for any of the five officers at the scene despite identified departures from Department policy;

(c) Black Love Resists in the Rust v. City of Buffalo, No. 1:18-cv-00719 (W.D.N.Y.), in which this Court on May 29, 2026 declined to grant the City summary judgment on equal-protection claims supported by expert analysis of the Department's own enforcement data;

(d) The disciplinary record described at Paragraphs 153 and 154, reflecting 934 misconduct allegations against Department officers between 1995 and 2023, of which approximately 9.2% were sustained, no terminations among the sustained cases, and the absence of any systematic Departmental database by which patterns could be detected; and

(e) The City's own arrest data described at Paragraphs 133 through 141.

261. The City failed to train and supervise its officers on matters where the need was obvious, including that a civilian's request for an officer's name or badge number is protected by the First Amendment and cannot supply grounds for arrest; that a refusal to accept a citizen's complaint may not be enforced by arrest; that exculpatory video reviewed at the scene must be preserved and disclosed rather than omitted from a charging instrument; that an officer may not swear to facts he has personally seen to be false; and that a subordinate officer must intervene, and may not defer to a supervisor, when an arrest lacks probable cause.

262. The City's failure amounted to deliberate indifference. Its policymakers knew to a moral certainty that officers would be asked for their names and badge numbers and would be asked to take citizen complaints, because those situations arise in the ordinary course of patrol; the situation presents a choice that training and supervision make less difficult; and the wrong choice predictably causes constitutional injury. The City had notice through the prior lawsuits, settlements, and complaints described above, and it made no meaningful change.

263. The City ratified the Defendant Officers' conduct. No officer was investigated or disciplined in connection with Mr. Webster's arrest, the accusatory instruments sworn against him, or the handling of his property, even after the prosecution was dismissed and after Mr. Webster raised the handling of his property with the Department's Internal Affairs division.

264. The City's policies, customs and practices, and its failure to train, supervise and discipline, were the moving force behind the violations of Mr. Webster's constitutional rights. The arrest was carried out by an entire shift, including a lieutenant, a detective and patrol officers, who treated a badge-number request as grounds for a felony arrest minutes after stating on camera that no crime had occurred. That is not an individual lapse.

265. As a direct and proximate result of the foregoing, Mr. Webster suffered a loss of liberty, humiliation, emotional distress, damage to his reputation and business, and other injuries, and was damaged in an amount to be determined at trial.

## DEMAND FOR JURY TRIAL

266. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

**PRAYER FOR RELIEF**

Plaintiff, David W. Webster, Jr., prays for relief and demands judgment as follows:

1. That Mr. Webster be awarded compensatory damages against all Defendants in an amount to be determined at trial;

2. That Mr. Webster be awarded punitive damages against each of the individual Defendants in an amount to be determined at trial;

3. That this Court, pursuant to 42 U.S.C. § 1988, issue an order awarding Plaintiff reasonable attorneys' fees, together with the costs of this action against all Defendants; and

4. That this Court award such other and further relief, together with any other legal or equitable relief, or both, as the Court deems just and proper.

Dated: November 11, 2026

Buffalo, New York

DAVENPORT LAW PLLC
Attorneys for Plaintiff

/s/ Chad A. Davenport
Chad A. Davenport, Esq.
6384 Deanna Drive
Hamburg, New York 14075
(716) 217-0328
cdavenport@davenport.law